No. 34,784

THE CITIZENS STATE BANK, *Appellant*, v. BEN PAULY, *Appellee.*

(102 P. 2d 966)

Opinion filed June 8, 1940.

*Claude I. Depew, W. E. Stanley, Lawrence Weigand, William C. Hook, Lawrence E. Curfman* and *Sidney J. Brick,* all of Wichita, for the appellant.

*Roy H. Wasson* and *Clair E. Robb,* both of Wichita, for the appellee.

The opinion of the court was delivered by

HOCH, J.: This was an action on a promissory note, the plaintiff claiming as a holder in due course for value. The defendant prevailed, and the plaintiff appeals. The determining questions presented are whether the note at issue is a negotiable instrument, and. if not, whether the record supports a verdict for the defendant.

Pauly, the appellee, gave the note in payment of premiums for crop insurance issued by the Sowers Plan Crop Insurance Mutual Company. The policies covered about 230 acres of growing wheat during the year 1938, and insured against loss from any cause, including crop failure. The note reads as follows:

"104.77                                                    VIOLA, KAN., January 7, 1938.

"On or before August 1, 1938, I, we, or either of us, promise to pay to the order of: Sowers Plan Crop Insurance Mutual Company at Topeka, Kan., the sum of one hundred four and 77/100 dollars with eight percent interest per annum after date of maturity.

"To secure the payment of this note, I, or we, do hereby mortgage and convey unto the payee, or its assigns, the crops described, and this mortgage extends to and covers said crops, whether standing and growing, or when cut and in shock or stack, and/or when threshed and in the bin, granary or otherwise.

"The crops covered consist of all interest in 86 and ⅔ interest 145 acres of wheat located in the SW quarter section of section 1, township 29, range 3 west, county of Sedgwick, state of Kansas.

"In the event of crop failure, I, or we, do hereby assign that portion of any insurance collected from the Sowers Plan Crop Insurance Mutual Company necessary to pay this note to Sowers Plan Crop Insurance Mutual Company. P. O. Address, Viola, Kan.

No......................... Due Aug. 1, 1938.                    Signed: BEN PAULY."

The Citizens State Bank of Topeka, appellant, alleged that it acquired the note on February 1, 1938—six months before maturity —by endorsement from the United Investment Company.

In his answer the defendant denied generally the allegations of the petition, and specifically denied that the plaintiff was a holder in due course for value; alleged that if the plaintiff in any manner obtained the note, it did so with knowledge of the infirmities therein; denied that the payee had any authority to transfer the note; alleged that prior to maturity of the note he suffered a crop loss in excess of $200; that he reported the loss to the insurance company; that the company sent a respresentative to adjust the loss, and that the adjuster agreed, in the early part of July, 1938, that the loss was approximately $130 and that the note being for less than the crop loss, would be canceled, and that the company would mail him a check for the balance due; that a short time thereafter another adjuster called upon him and agreed that his crop loss was $141, which would leave a balance due him of about $37; that the adjuster stated that the note was in the office of the insurance company and would be marked paid and immediately returned to him; that the note was not returned to him, nor did the company ever pay him any part

of the balance due; and that by reason of these facts—and others not necessary to narrate here—the indebtedness represented by the note had been fully discharged.

Prior to this action, the insurance company had gone into receivership.

The reply was a general denial. There was, however, a stipulation that the defendant had received no payment on his crop loss either from the company or the receiver.

The action was tried in November, 1939, before a jury. It is unnecessary to narrate the record in detail. Suffice it to say that by appropriate motions the plaintiff protected its contention that the note was negotiable, was acquired in due course for value, and that any defenses the maker might have against the payee were not available to him in this action. The court refused to accept the plaintiff's view that the note was a negotiable instrument, and instructed the jury that if they found that the plaintiff purchased the note for value, before maturity, it did so with notice that the maker had assigned such portions of insurance collected necessary to pay the note, and if they found that Pauly had suffered a crop failure equal to the face of the note or the company had so agreed, he had the right to pay the note out of insurance collected. Other parts of the instruction, not here material, need not be recited.

The jury found generally for the defendant. Whereupon, by a motion for judgment notwithstanding the verdict, the plaintiff again raised the issue of negotiability. The motion was overruled.

Some procedural questions, apparent on the record, but which are not urged by the parties, will be disregarded. And before proceeding directly to the two main questions involved, we note briefly some preliminary facts and secondary contentions. The note shows on its face that it was given to a mutual crop insurance company. Being bound to know what so appears, any holder took the note subject to any limitations which may exist, under the law, upon the power of such a company to take notes or to transfer them. The record clearly discloses that the plaintiff bought the note with knowledge that it had been given in payment of insurance premiums, though the plaintiff's representative testified he did not know that he had ever examined one of the Sowers company policies. It may be noted in passing that when the instant note was given, mutual companies had a right to accept notes, secured by mortgage upon the crop, in payment of premiums under the provisions of G. S. 1935,

40-1207. This authority to take notes instead of cash was subsequently repealed. (G. S. 1939 Supp. 40-1207.)

The appellee contends that the insurance company was without legal authority to sell and transfer its premium notes, and that the purchaser was bound to know of such incapacity. The record does not disclose whether the company sold this note for less than its face amount, though the plaintiff offered to show that the company sold a number of premium notes, including this one, to the United Investment Company for a total amount representing a discount of seven or eight percent. Upon objection of the defendant, however, this testimony was excluded. We recognize the substantial character of arguments that mutual companies, which pay losses out of premium or assessment payments from its members, have no right to sell their premium notes, and particularly no right to sell them at a discount. All members are entitled to equal treatment in creation of reserves for payment of losses. However, in view of the conclusions hereinafter stated, we do not now determine that question.

One proposition advanced here by the appellant is that even if the note be nonnegotiable, the maker would not be entitled in the present case, to offset his crop loss against the note. The argument is based on the contention that policyholders in a mutual insurance company have no such right in the event the company has become insolvent. We do not find, however, that this issue was raised in the trial court, and it will not be here considered.

We come to the main issues.

First, is the note at issue a negotiable instrument, under the statute: (G. S. 1935, ch. 52.) The pertinent sections of the statute are G. S. 1935, 52-201 to 52-205. There can be no dispute that the first paragraph of the note (*supra*) is an unconditional promise to pay a certain sum, and otherwise meets the requirements of section 52-201. The controversy centers about two later paragraphs in the note, hereinafter referred to as "the mortgage clause" and the "assignment clause," and which read as follows:

"To secure the payment of this note, I, or we, do hereby mortgage and convey unto the payee, or its assigns, the crops described, and this mortgage extends to and covers said crops, whether standing and growing, or when cut and in shock or stack, and/or when threshed and in the bin, granary or otherwise. . . In the event of crop failure, I, or we, do hereby assign that portion of any insurance collected from Sowers Plan Crop Insurance Mutual Company necessary to pay this note to Sowers Plan Crop Insurance Mutual Company."

The arguments urged for nonnegotiability are that the promise to pay is not unconditional because it is a promise to pay out of a particular fund (G. S. 1935, 52-203) ; and that the instrument "contains an order or promise to do an act in addition to the payment of money," which destroys negotiability under provisions of G. S. 1935, 52-205.

The appellee does not stress the mortgage clause, merely contending that "the mortgage clause in this particular type of note and in connection with the other provisions in the note make it nonnegotiable." Although decisions in other jurisdictions are cited, appellant cites no decision of this court and we have found none, where the question of negotiability turned upon the incorporation of a chattel mortgage in the note itself. Cases which involve mere references to *collateral* instruments or other security, or which involve provisions (1) to (5) of G. S. 1935, 52-205, which do not affect negotiability, are not in point. Appellee cites the case of *Rohr v. Jeffery*, 128 Kan. 541, 278 Pac. 725, in which a note containing a chattel mortgage was held to be nonnegotiable. But that case is not persuasive upon the immediate question. In the Rohr case the note not only contained a chattel mortgage, but also contained *a promise not to mortgage* certain property. It was the latter promise, along with others, which, the court said, destroyed negotiability. (G. S. 1935, 52-205.) Inasmuch as the question of whether the incorporation in a note of a mortgage which constitutes a completed act by the maker and which contains no promise to do anything in the future has not been adequately presented on both sides, we consider it inadvisable to determine the question in this case, since our conclusion as to the assignment clause, hereinafter stated, makes it unnecessary to do so.

We now consider the character and effect of the assignment clause in the instant note. At the outset, we call attention to inaccurate references to this clause, occurring in the briefs. The clause is at times treated as an assignment of *whatever may become due* from the company, in settlement of crop losses. Note, for instance, appellant's argument on page 12 of its brief, that "prospective takers of these notes might hesitate to purchase them if they were compelled to look solely to the personal and financial integrity of the makers, but with the *assignment of the fund which might become due* in the event of a crop loss the note would become more attractive" (italics ours). But that is not the way the clause

reads. It is not an assignment of *amounts due* to pay losses, but an assignment of "that portion of any insurance *collected*." In other words, the assignment refers to *any money collected* from the company and *in the hands* of the insured. If the assignment were of *amounts due* instead of *amounts collected,* then the case of *Van Arsdale v. Martin,* 81 Kan. 499, 106 Pac. 42, upon which the appellee largely relies, would be more in point, although there would even then be strong argument for distinguishing it from this case. It was said in the Van Arsdale case that the provision in question clearly left an option in the maker of the note to reduce his debt by the amount due from the company in case of loss. It is not so clear that an assignment to the payee, for reducing the note, of a *debt due* from the company in case of loss covered by insurance, would leave an option in the *maker* which might reduce the obligation on the note. The primary test to be applied in determining whether a disputed provision renders the amount that will be due on the note uncertain and therefore destroy negotiability, is whether the provision leaves a possibility of reduction in the amount collectible on the note. "Certainty of amount" is not affected if the provision gives the maker no opportunity of reducing his note obligation. However, since the instant clause is not an assignment of a *debt due* but of *money collected,* a comparison with the clause in the Van Arsdale case, *supra,* is not much in point.

What then is the meaning and effect of the assignment clause? We agree with appellant that whatever it meant, it was *a present assignment.* But what did the maker assign? In effect, he said, "I now agree and promise that if I suffer a crop loss and collect for it from the company, I will hold such collection for the benefit of the holder of this note to whatever extent that may be necessary to pay the note." While the assignment is *to the company,* the note is payable "to the order of" the company and any subsequent holder would succeed to whatever rights the payee might have under the assignment. In fact, it is not easy to see that as between the maker and the payee, the assignment would have great significance. In case of crop loss, the company's liability and the maker's liability on the note would simply be offset against each other and there would not likely be any insurance *collected* by the insured as long as the note was fully paid. In order, therefore, to give the assignment clause much significance, it must contemplate the rights of some endorsee or other subsequent holder. As to subsequent holders,

the clause does have real significance. To illustrate: let us assume that the company has transferred the note for value and no longer has any interest in it. A loss is suffered before maturity of the note and the company pays the loss. The insured has thus *"collected"* for the loss. What now is the effect of the assignment clause? Its plain significance is that having *"collected"* for the loss and his note being unpaid, the maker has agreed to keep intact for the benefit of the holder of the note, whoever he may be, the amount he has *"collected."* In the absence of such a clause, the holder of the note, in the circumstances stated, could only look to the general credit of the maker to enforce payment. But with this assignment clause in the note, he has the additional promise of the maker that if he does collect insurance while the note is unpaid, he will not spend the amount collected, or commingle it with other assets, but will retain it intact insofar as necessary to protect his obligation on the note. Whatever it may be called, this assignment constitutes in substance the imposition of a trust upon any future collections for losses as long as the note is unpaid. If it be said that such a trust would afford little additional security for the note, the answer is that the question here is not one of *security* but of *negotiability.* Although the breaking of such a promise might leave the holder with little more recourse in case of default on the note, the fact remains that the note contains the promise; and such an additional promise clearly makes the note nonnegotiable under the provisions of G. S. 1935, 52-205. (Some illustrative examples of additional promises in a note which have been held to render it nonnegotiable: a promise to pay expenses on repossessing the article for which the note was given, and to finance its reconditioning, reselling, etc., *International Harvester Co. v. Watkins,* 127 Kan. 50, 272 Pac. 130; a promise that "no part of the crop shall be mortgaged or sold," *Rohr v. Jeffery,* 128 Kan. 541, 278 Pac. 725; a promise that the maker will "pay taxes assessed upon the note or its mortgage security," *Collidge & McClaine v. Saltmarsh,* 96 Wash. 541, 165 Pac. 508; *Hubbard v. Wallace Co.,* 201 Ia. 1143, 208 N. W. 730; 45 A. L. R. 1065; a promise to "insure the property pledged," *First State Savings Bank v. Russell,* 244 Mich. 298, 221 N. W. 142; a promise to "hold all fertilizers bought for us in trust," *First Nat. Bank v. Elba Hardware and Furniture Co.,* 223 Ala. 493, 137 So. 173; a promise to "keep the machine, in payment for which it was given, in repair," *Albany State Bank v. Anthony,* 121 Oreg. 277, 254 Pac. 806.)

The note being nonnegotiable, the question remains whether the maker established a defense to the note, as against the payee. The maker alleged a loss under the policy, and an agreement before maturity that the loss was greater than the amount of the note, that the debt of the maker was discharged and that the note would be canceled, and returned to the maker. Competent evidence was submitted to support these allegations. The jury found generally for the defendant. The record is ample to support a verdict as against the insurance company. Having no greater rights than the insurance company would have, the defense is equally available as against the appellant. These conclusions make it unnecessary to discuss other issues raised. It follows that the judgment must be affirmed. It is so ordered.